KASS HARSTAD (Bar No. 8419)
ERIKA BIRCH (Bar No. 7831)
CHAD JOHNSON (Bar No. 10101)
**STRINDBERG & SCHOLNICK, LLC**
1516 W. Hays Street
Boise, ID 83702
tel: 801.359.4169
fax: 801.359.4313
kass@utahjobjustice.com
erika@idahojobjustice.com
chad@idahojobjustice.com

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **JESSICA BOOD**, <br><br> Plaintiff, <br><br> vs. <br><br> **WALMART, INC.,** a Delaware corporation, <br><br> Defendant. | **COMPLAINT AND JURY DEMAND** <br><br> Case No. <br><br> Judge: |

Plaintiff Jessica Bood, ("Employee", "Plaintiff", or "Ms. Bood"), by and through her attorney, hereby complains against Defendant Walmart, Inc. ("Walmart" or "Defendant"), as follows.

### I.     PRELIMINARY STATEMENT

1.     This suit is brought by Jessica Bood, a female employee of Walmart employed during 1999 who was subjected to gender discrimination by Defendants in violation of Title VII

of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq*. ("Title VII").

2. Plaintiff seeks all available remedies including damages, attorneys' fees, costs, and interest, and compensatory damages.

3. Over fifteen years ago, the Dukes v. Wal-Mart class action commenced as a national class against Wal-Mart Stores, Inc., the largest retailer in the world and the largest private employer in the United States. The action alleged that female employees in Wal-Mart and Sam's Club retail stores were discriminated against based on their gender, with respect to pay and promotion to management track positions, in violation of Title VII.

4. In 2004, the United States District Court for the Northern District of California certified a national class of female employees challenging retail store pay and management promotion policies and practices under Fed. R. Civ. P. 23(b)(2). On June 20, 2011, the United States Supreme Court reversed that class certification order, holding that the national class could not be certified based on the facts in the record.

5. On June 24, 2011, the plaintiffs in Dukes moved to extend tolling of the statute of limitations in the Northern District of California. On August 19, 2011, the court granted plaintiffs' motion in part and extended the tolling period awarded to former class members under American Pipe and Construction Co. v. Utah, 414 U.S. 538, 554 (1974) for a limited time, and set forth the dates by which former class members had to file Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6. All former class members who had never filed an EEOC charge had until May 25, 2012, to file charges in states with 300 day limits.

7. The relevant time period in this action for Plaintiff's claims is based on the limitations period from Dukes.

8. In accordance with these deadlines, Ms. Bood filed a Charge of Discrimination with the EEOC on May 24, 2012 alleging sex discrimination.

9. The EEOC issued Ms. Bood's individual right to sue notice on September 23, 2019, and Ms. Bood received the notice September 26, 2019. Ms. Bood has filed this Complaint within the 90 days.

10. Ms. Bood has therefore exhausted her administrative remedies and complied with the statutory prerequisites of Title VII by timely filing EEOC charges of discrimination.

## II.  PARTIES

11. At all times relevant to the Complaint, Ms. Bood resided in the State of Idaho, and she was employed by Walmart at Store # 1878 in Rexburg, Idaho.

12. Defendant Walmart is a massive corporation, incorporated under the laws of Delaware, operating within the State of Idaho during all times relevant to this complaint.

13. In February of 2018, Walmart changed its name from Wal-Mart Stores, Inc. to Walmart, Inc.

## III.  JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Ms. Bood is bringing claims for violations of federal law.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because all of the employment practices alleged to be unlawful were committed within the jurisdiction of this Court.

## IV.     GENERAL ALLEGATIONS

**Organizational Structure and Hierarchy**

16.     In the time period relevant to this lawsuit, Walmart retail operations were divided geographically into six Walmart divisions, each consisting of approximately six regions. Each region was split into multiple districts. Approximately seven to ten stores were assigned to each district.

17.     All stores typically had the same or similar job categories, job descriptions and management hierarchy. At the bottom of the ladder, the primary entry-level hourly positions were Cashier, Sales Associate, and Stocker.

18.     The first step above an entry-level job was an hourly supervisor position, including Department Manager, Customer Service Manager and Support Manager. The next step up was Management Trainee ("MIT"), a four-to-five-month program that prepared employees to be Assistant Managers, a salaried position. Each store had several Assistant Managers. The next level was Co-Manager, a position used only in larger stores, and then Store Manager.

19.     From 1998-2004, Store Managers set pay for hourly employees following guidelines governing compensation. Each Store Manager reported to their District Manager, and in order to maintain a consistent administration of the pay guidelines, certain hourly pay decisions were reviewed by the District Manager for approval. Specifically, exceptions to the pay guidelines, as well as some actions within the Guidelines (such as setting starting pay more than 6% above the minimum rate) were reviewed by the District Manager, who had to decide whether or not to approve the Store Manager's pay decision. Thus, the Store Managers received regular feedback from the District Managers about their decision making.

20. District Managers reported to the Regional Vice President ("RVP"). In addition to the formal feedback from District Managers to Store Managers through the hourly pay exception process, both the RVP and District Managers spent a large amount of time touring stores and talking with the Store Managers in those stores. Similarly, the RVP held regular in-person meetings and conference calls with all the District Managers. These regular meetings touched on many aspects of store operations, including people issues. Thus, there was a constant stream of communications with district and regional management that provided feedback to Store Managers about their hourly compensation decisions and guidance about how Walmart regional management expected them to carry out their responsibilities.

21. The RVP also had overall responsibility for pay increases for Assistant Managers and had influence over promotions into MIT positions.

22. Each Region also had at least one Regional Personnel Manager ("RPM"), who was responsible for promotion into the MIT program and starting pay for MIT and Assistant Managers.

**Pay Discrimination**

23. During the relevant time period, Walmart set compensation of store-based employees using a common set of guidelines, which Walmart's managers applied consistently in the store that Ms. Bood worked at, Store Number 1878. The pay guidelines established basic standards for setting pay rates at hire and subsequent pay adjustments for hourly and salaried employees.

24. From 1998 through June 2004, Walmart assigned jobs to five classes, the top two of which were only used for a few specialty jobs. Jobs were assigned to the same class regardless of department. Each successive job class had a higher minimum starting pay rate.

25. The minimum pay levels at hire ("start rates") for each job category were established for Store Number 1878 with the approval of the applicable District Managers and RVP. Thereafter, an employee's pay level could be adjusted: (1) after an initial probationary period; (2) if the employee was promoted to a higher job class or into management; (3) on an annual basis, if the employee satisfied minimum performance standards; or (4) if the employee had been awarded a special "merit" raise.

26. The Store Manager had the initial responsibility to set pay rates for individual hourly employees within the pay guidelines, subject to constraints set by the District Manager and RVP. Where a Store Manager set a pay rate above or below the pay guidelines, the rate was called an "exception."

27. The pay rate for a new employee could be set up to a maximum of $2 per hour above the start rate, but if the new employee's rate was more than 6% above the established start rate for that pay class, a computer program in the payroll system would prohibit payment at this rate unless and until the Store Manager manually entered the pay rate for that employee.

28. All hourly pay exceptions were automatically reported to the District Manager, who could approve or disapprove such exceptions. The RPM was also informed of all hourly pay exceptions and was required to ensure that hourly compensation was consistent among employees in the Region.

29. In Store Number 1878, District Managers, the RPM, and the RVP regularly received reports of all employees whose hourly pay in a job category was more than 10% below or 5% above the average pay in that category. District Managers performed quarterly audits of each store's compliance with company policies and Region-specific policies, including compensation policies, which were then reported to the RPM and RVP.

30. District Managers and the RVP had ultimate authority over whether, and by how much, to adjust the pay of hourly employees, including those employees listed on exception reports.

31. In Store Number 1878, managers were not required to use job-related criteria, such as job performance or experience, in setting, adjusting, or approving compensation for individual employees. Managers did not document the reason for setting, adjusting, or approving the compensation of individual employees. The RVP and District Managers did not hold the Store Managers in Store Number 1878 accountable for the factors the Store Managers used in making pay decisions or in ensuring those factors comported with the law, nor did they require any documentation of the reasons for the compensation paid to individual employees. Nor did Walmart managers specify the weight to be accorded any particular requirement in setting or adjusting compensation.

32. During the relevant time period, women who held hourly positions in Store Number 1878 were regularly paid less than similarly-situated men, although, on average, those women had more seniority and higher performance ratings than their male counterparts. This gender pay difference adverse to women was statistically significant in Store Number 1878, even when nondiscriminatory objective factors, such as seniority, estimated years of work experience prior to hire by Walmart, performance, job title, and other factors are taken into account.

33. Walmart's compensation policies prior to 2005 – including its policies of using a set of prescribed factors to set starting pay for hourly associates at a pay rate above the minimum rate, granting discretion to Store Managers to set starting pay, permitting them to evaluate and weight the prescribed factors as they chose, failing to require those Store Managers to document the reasons for setting starting pay and merit increases as they did, and setting pay adjustments

based on the associate's prior pay – have had an adverse impact upon its female employees in Store Number 1878 including Ms. Bood.

34.     During the relevant time period, the RPM, RVP, and District Managers received regular reports about compensation for hourly and salaried employees within Store Number 1878, showing that female employees were paid less than men on average. These managers therefore had knowledge of the compensation discrimination present in the stores over which they had authority.

**Walmart Managers' Reliance on Discriminatory Stereotypes**

35.     In the absence of job-related compensation criteria, Walmart's managers in Store Number 1878, and those supervising Store Number 1878, relied on discriminatory stereotypes and biased views about women in making pay and promotion decisions.

36.     A 1998 survey of Walmart managers revealed that there was a "good ol' boy philosophy" at Walmart, that many managers were "close minded" about diversity in the workplace, and that some District Managers "don't seem personally comfortable with women in leadership roles."

37.     The findings of the 1998 survey echoed an earlier 1992 report by a group of female Walmart management employees, who identified a number of concerns for women employees, including the following: "Stereotypes limit the opportunities offered to women," "[c]areer decisions are made for associates based on gender," "[a]ggressive women intimidate men," "men are interviewed as the replacements, women are viewed as support," and "[m]en's informal network overlooks women."

38.     All Walmart Store Managers have been required to attend training programs at the company's Walton Institute. These managers were advised at the Institute that the reason there

are few senior female managers at Walmart is because men were "more aggressive in achieving those levels of responsibility" than women. Managers were cautioned that efforts to promote women could lead to the selection of less-qualified women over more-qualified men.

39. On or about January 24, 2004, at a meeting of all Walmart District Managers presided over by Walmart's CEO Thomas Coughlin, the District Managers were told that they were the key to running the stores: "You are the culture." The key to success was described as "single focus to get the job done. . . . Women tend to be better at information processing. Men are better at focus single objective. Results driven." The District Managers were instructed to create a "culture of execution" and a "culture of results" as they picked "[f]uture leaders."

40. In deciding which employees to promote as department managers ― hourly positions which were often stepping stones into salaried management ― Store Managers in Store Number 1878 would often consider women only for "female" departments, such as health and beauty, jewelry, softlines, and the service desk.

41. Managers in Store Number 1878, and managers who supervised that store, justified denying promotions to women or paying them less than their male employees because of perceived family obligations of the women and male responsibility to support their families or because of their presumed inability to relocate.

42. Furthermore, managers in Store Number 1878 – who were nearly all male – would invite male employees to lunch or invite male associates to join managers on breaks. Women were purposefully excluded.

**Walmart's Ineffective Anti-Discrimination Efforts**

43. For many years, Walmart had no meaningful policies or practices to hold managers in, or managers supervising, Store Number 1878 accountable, financially or otherwise, to equal employment and diversity policies and goals.

44. Starting in 2000, Walmart asked District Managers to set diversity "goals" for advancement of women in management. The goals were based on each manager's individual views on what was attainable and were not tied to any objective measures of availability or qualifications. Prior to 2004, failure to meet diversity goals had no financial or other consequence for managers in, or managers supervising, Store Number 1878.

45. As late as 2003, Walmart CEO Coughlin was not aware of any diversity goals or whether managers had met such goals. Many Store Managers were also unaware of the existence of any diversity goals.

46. Until at least 2003, there had never been any diversity goals set for individual stores, or for any compensation practices in Store Number 1878.

**Ms. Bood's Employment at Walmart**

47. Wal-Mart discriminated against Ms. Bood because she is female.

48. Ms. Bood observed Wal-Mart pay her less than male employees who had equal or lesser qualifications, and who worked in the same or similar positions.

49. Ms. Bood recalls waiting for her initial interview at the Walmart in Rexburg.

50. There, she overheard the hiring manager tell her male counterparts how much they would be paid upon being hired.

51. During Ms. Bood's interview, she was not informed how much she would be making.

52. After Ms. Bood was hired at the Rexburg store, she learned more about the pay of her coworkers. She learned that Walmart was consistently paying her less than her male counterparts.

53. On paydays, managers at Store Number 1878 assigned random employees to hand out paychecks, with everyone standing around in a group waiting for their check.

54. Ms. Bood received this assignment and saw the checks of her co-workers.

55. Those paychecks showed that her male counterparts were making significantly more than she was.

56. Some of the checks showed that Ms. Bood's male co-workers who had been hired at the same time and into the same position as Ms. Bood were making at least $1.00 more per hour than she was.

57. After discovering the pay discrepancy, Ms. Bood began asking other male co-workers how much they were making per hour.

58. She was upset to repeatedly hear they were all making at least $1.00 more per hour than she was.

## CLAIM FOR RELIEF
### (Pay Discrimination in Violation Title VII)

59. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

60. Over a time period spanning many years, including the time Ms. Bood worked at Walmart, the company acted with deliberate indifference toward its obligation to make job wage decisions without regard to gender.

61. Walmart repeatedly chose to pay males more than females because of their gender.

62. Walmart refused to pay Ms. Bood in accordance with her male counterparts.

63. Walmart discriminated against Ms. Bood on the basis of gender and treated her differently than a male employee.

64. As a result of the Walmart's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, Ms. Bood is entitled to damages, including lost wages; compensatory damages; emotional distress damages; prejudgment interest; and attorneys' fees and costs expended in this action.

65. Walmart's unlawful conduct toward Ms. Bood was done with reckless disregard for her federally protected rights, and as such, Walmart should be subject to punitive damages as well.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award the following relief:

a. For Plaintiff's lost wages, compensation, and benefits;

b. For compensatory damages;

c. For general damages including emotional distress;

d. For punitive damages;

e. For Plaintiff's reasonable attorneys' fees, including expert witness fees as provided by 42 U.S.C. §1988 and 42 U.S.C. §2000e-5;

f. For pre-judgment and post-judgment interest at the highest lawful rate; and

g. For costs of court and such other relief as the court deems just and equitable.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 18th day of December, 2019.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Kass Harstad
Attorneys for Plaintiff